# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| TIM VAN DER WEIDE, <br><br> Plaintiff, <br><br> vs. <br><br> CINCINNATI INSURANCE COMPANY, <br><br> Defendant. | No. C14-4100-LTS <br><br> **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case is before me on defendant's motion (Doc. No. 40) for partial summary judgment. Plaintiff has filed a resistance (Doc. No. 41) and defendant has filed a reply (Doc. No. 44). No party has requested oral argument and, in any event, I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c). The motion is fully submitted and ready for decision.

## II. PROCEDURAL HISTORY

Plaintiff Tim Van Der Weide commenced this action against defendant Cincinnati Insurance Company (Cincinnati) on November 7, 2014, by filing a three-count complaint (Doc. No. 1). He asserts claims of (1) breach of insurance contract, (2) bad faith and (3) punitive damages, all in his individual capacity and as trustee of the Tim Van Der Weide Revocable Trust, assignees of Bouma & Company, Inc. (Bouma), and United Fire & Casualty Co. (United Fire). On December 5, 2014, Cincinnati filed an answer (Doc. No. 4) in which it denies liability and asserts various defenses. Trial is scheduled to begin January 29, 2018.

On August 11, 2015, Van Der Weide filed a motion for partial summary judgment. Doc. No. 9. On September 17, 2015, Cincinnati filed a motion for summary judgment. Doc. No. 15. On October 28, 2015, United States District Judge Mark W. Bennett, to whom this case was then assigned, entered an order (Doc. No. 20) regarding those motions. Judge Bennett determined that the question of whether the faulty workmanship of a subcontractor causing consequential damages beyond the defective work product itself may constitute an "occurrence" was an unresolved question of Iowa law until that same day, when the Iowa Court of Appeals decided that question in the affirmative in *National Surety Corp. v. Westlake Investments, LLC*, 872 N.W.2d 409 (Iowa Ct. App. 2015). Doc. No. 20 at 1. As a result, Judge Bennett directed the parties to submit additional briefing in light of *National Surety*.

On November 18, 2015, Cincinnati filed an unresisted motion to stay further proceedings while the Iowa Supreme Court reviewed the *National Surety* decision. Doc. No. 23. On November 19, 2015, Judge Bennett granted the stay pending the decision of the Iowa Supreme Court. Doc. No. 25. On June 10, 2016, the Iowa Supreme Court affirmed the decision of the Court of Appeals. *See National Surety Corp. v. Westlake Investments, L.L.C.*, 880 N.W.2d 724 (Iowa 2016).[1]

On January 12, 2017, I granted Van Der Weide's motion for partial summary judgment regarding Cincinnati's duty to defend and denied Cincinnati's motion for summary judgment. Doc. No. 39. I found that the CGL policy at issue in this case is so similar to the one in *National Surety* that the Iowa Supreme Court's holding in *National Surety* controls my construction of that policy. *Id.* at 13-14. I further found that coverage had been triggered by virtue of an "occurrence" and "as a matter of law that a duty to defend arose no later than May 5, 2014, after Cincinnati was put on notice of allegations that defective work by Bouma's subcontractor caused damage to the home to occur during the policy period." *Id.* at 17.

---

[1] This case was assigned to me on February 17, 2016.

On February 23, 2017, Cincinnati filed the instant motion for partial summary judgment, seeking dismissal of the bad faith and punitive damages claims. Doc. No. 40.

### III.  RELEVANT BACKGROUND FACTS

I previously summarized the factual history of this case as follows:

> This case arises from prior litigation involving Van Der Weide and Cincinnati's insured, Bouma. Van Der Weide contracted with Bouma to construct a house in Orange City, Iowa, in 1996. Before construction began, Bouma purchased a commercial general liability (CGL) policy and a separate umbrella policy from Cincinnati, which were in effect from January 30, 1996, to January 30, 1999 (the policy period). After those policies expired, Bouma purchased insurance policies from United Fire.
>
> Bouma utilized various subcontractors to build the home, including Elkato Masonry (Elkato), which was retained to construct brick veneer and masonry around the house. The home was substantially completed in February 1998 and Van Der Weide moved in during August 1998. No claims were made during the policy period.
>
> At some point after moving into the house, Van Der Weide observed a small amount of water ponding in an unfinished storeroom in the basement. This recurred periodically after rains. Van Der Weide alerted Bouma of the leaking but did not claim that any damage resulted.
>
> In August 2010, Van Der Weide noted that the drywall was peeling in the great room. He asked Bouma to remove the drywall between the windows. Doing so revealed significant water damage. The insulation, studs and sheeting were fully saturated and the wood was severely rotted. To determine the cause, both Bouma and the homeowners insurer retained experts. Kevin Godwin investigated for Bouma and Donald Staley investigated for the insurer. While defective windows were considered as a cause, Godwin and Staley concluded that defective masonry installation permitted substantial water infiltration without any mechanism for the water to escape. Both investigators noted the lack of weeps and through-wall flashing behind the masonry veneer. Godwin also noted substantial mortar bridging of the required cavity between the masonry and the sheeting. As the investigation continued, it was discovered that the walls around the entire house had serious damage, requiring their removal and replacement.

3

Van Der Weide contends that because of the construction defects, moisture infiltrated the masonry and started to cause damage soon after the masonry veneer was installed.

In March 2011, Van Der Weide sued Bouma, Elkato and others in the Iowa District Court for Sioux County (the state court case), alleging negligence and demanding damages. United Fire defended Bouma under a reservation of rights. On July 30, 2012, Bouma and United Fire tendered the defense and indemnity obligations to Cincinnati. On August 10, 2012, Cincinnati rejected the tender and denied any duty to defend Bouma, contending that the alleged defects in the Van Der Weide home were discovered after Cincinnati's policy period ended.

On August 14, 2013, Bouma again tendered defense and indemnity obligations to Cincinnati. Cincinnati retained counsel to evaluate its coverage obligations. On January 9, 2014, Cincinnati again denied coverage on grounds that the property damage occurred outside the policy period. Cincinnati argued that Van Der Weide's pleadings in the state court case contained no allegation that any physical damage or loss occurred during the policy period.

Following this second denial, Bouma's counsel advised Cincinnati that two experts would testify that the property damage occurred due to construction defects and that the damage began shortly after substantial completion in 1998. Cincinnati again denied any duty to defend or indemnify Bouma.

Van Der Weide, Bouma and United Fire then entered into an Agreement for Covenant not to Execute and Stipulation for Entry of Judgment by Confession, pursuant to *Red Giant Co. v. Lawler*, 528 N.W.2d 524 (Iowa 1995). Pursuant to that agreement, Bouma confessed judgment in Van Der Weide's favor, in the amount of $2,000,000, on September 30, 2014, while Bouma and United Fire assigned to Van Der Weide any and all claims Bouma or United Fire may have against Cincinnati or any other person arising out of the incident. Van Der Weide, as the assignee of Bouma and United Fire, then filed this action. Van Der Weide contends Cincinnati breached its insurance contracts with Bouma by failing to defend or indemnify Bouma in the state court case.

Doc. No. 39 at 2-4 (footnote omitted). As for the insurance policies at issue, I explained:

The CGL and umbrella policies Cincinnati issued to Bouma were occurrence policies, obligating Cincinnati to provide coverage for property damage occurring during the policy period. The CGL policy defines "property damage" as:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

Doc. No. 9-2 at 26. The CGL policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The CGL policy contains the following, "your work" coverage exclusion:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." <u>This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor</u>.

*Id.* at 18 (emphasis added). The CGL policy also contains the following exclusion:

> "Property damage" to:
>
> (1)    Property you own, rent or occupy;
>
> (2)    Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
>
> (3)    Property loaned to you;
>
> (4)    Personal property in the care, custody or control of an insured;

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations. If the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.
>
> Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

*Id.* The CGL policy defines "your work" as follows:

> a. Work or operations performed by you or on your behalf; and
>
> b. Materials, parts or equipment furnished in connection with such work or operations.
>
> "Your work" includes:
>
> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
>
> b. The providing of or failure to provide warnings or instructions.

*Id.* at 27. The umbrella policy provides coverage, as follows:

> We will pay on behalf of the insured the ultimate net loss for occurrences during the policy period in excess of the underlying insurance or for occurrences covered by this policy which are either

> excluded or not covered by underlying insurance because of … property damage, anywhere in the world.

Doc. No. 9-3 at 11. The umbrella policy defines an occurrence as:

> an accident, or a happening or event, or a continuous or repeated exposure to conditions which occurs during the policy period which unexpectedly or unintentionally results in **personal injury**, **property damage** or **advertising liability**. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one **occurrence**;

*Id.* at 10 (emphasis in original).

Doc. No. 39 at 4-6.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party on the question,'" *Woods v. DaimlerChrysler*

*Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id*. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V. DISCUSSION

Cincinnati seeks summary judgment on Count Two (bad faith) and Count Three (punitive damages). I will address each count separately.

### A. Count Two – Bad Faith

In its opening brief, Cincinnati noted that Iowa law recognizes two types of insurance bad faith claims (first-party and third-party) and made an assumption that Van Der Weide is asserting a first-party claim in this case. Doc. No. 40-1 at 5. In his resistance, however, Van Der Weide explained that he is asserting both types of claims in his role as the assignee of United Fire and Bouma. Specifically, he contends that United Fire has a viable third-party bad faith claim while Bouma has a viable first-party bad faith claim. Doc. No. 41-1 at 1-3. Cincinnati addressed the third-party bad faith claim in its reply. Doc. No. 44 at 1-2.

#### 1. Third-Party Bad Faith (on behalf of United Fire)
##### a. Applicable Standards

Under Iowa law, "[a]n insured may bring a third-party bad-faith claim when 'an insurer's bad faith refusal to settle a third-party's claim against the insured within the policy limits exposes the insured to monetary liability exceeding policy limits.'" *Thornton v. Am. Interstate Ins. Co.*, --- N.W. 2d ----, No. 15-1032, 2017 WL 2200461, at *10 (Iowa May 19, 2017) (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 33 (Iowa 1982)). The Iowa Supreme Court has stated:

> We have recognized a bad-faith cause of action in an insurer's representation of an insured in a third-party liability claim. . . . We have reasoned that the insurer, in handling a claim which might exceed the policy, owes a fiduciary duty to the insured to act responsibly in settlement negotiation to prevent exposure of the insured to unreasonable risk. . . . This places a duty on the insurer to investigate the claim and take affirmative action as necessary to protect the interest of the insured.

*N. Iowa State Bank v. Allied Mut. Ins. Co.*, 471 N.W.2d 824, 828 (Iowa 1991) (citations omitted). The Court has also explained:

> [T]he duty of good faith arises out of the insurance contract and runs from the insurer to the insured. In an excess judgment case, the issue is whether the insurer is guilty of bad faith toward the insured in failing to settle an injured party's claim within policy limits.

*Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 258 (Iowa 1991). Thus, "[i]n meeting its duty to the insured, the insurer must give as much consideration to the insured's interests as it does to its own. It has no such relationship with a third party." *Long v. McAllister*, 319 N.W.2d 256, 262 (Iowa 1982).

### b. *Analysis*

Van Der Weide, as United Fire's assignee, contends that United Fire is entitled to recover from Cincinnati on a third-party bad faith theory. In its reply, Cincinnati states that it "does not understand the plaintiff's resistance." Doc. No. 44 at 1. I share Cincinnati's confusion. United Fire was never Cincinnati's insured in connection with the events at issue in this case. As set forth above, United Fire was Bouma's successor liability insurer, providing coverage for time periods after Cincinnati no longer served as Bouma's liability insurer. United Fire had no contractual relationship with Cincinnati through which Cincinnati assumed any fiduciary obligations to United Fire. As such, Iowa's law of third-party bad faith does not even remotely apply here.

In attempting to explain why a third-party bad faith claim nonetheless exists, Van Der Weide cites cases permitting excess insurance carriers to obtain indemnification from primary carriers who refuse to defend and indemnify their common insured. Doc. No. 41-1 at 2. If United Fire was an excess carrier and Cincinnati a primary carrier, and if Van Der Weide brought a claim for indemnification on behalf of United Fire, those cases might have relevance. However, none of those facts are present here. Van Der Weide,

acting as the assignee of a successor carrier, seeks to assert claim of third-party insurance bad faith. That claim fails under Iowa law.[2]

### 2. *First-Party Bad Faith (on behalf of Bouma)*
#### a. *Applicable Standards*

Under Iowa law, to prevail on a first-party bad faith claim the plaintiff must prove both that "(1) [the defendant] had no reasonable basis for denying the plaintiff's claim . . . and (2) the defendant knew or had reason to know that its denial or refusal was without reasonable basis." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). The first element is an objective one; the second element is subjective. *Id.*

With regard to the first element, "[a] reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law." *Id.* "Where an insurance claim is 'fairly debatable' the bad faith claim must fail." *Stahl v. Preston Mut. Ins. Ass'n*, 517 N.W.2d 201, 203 (Iowa 1994). In clarifying the fairly debatable standard, the *Bellville* Court stated:

> A claim is "fairly debatable" when it is open to dispute on any logical basis. Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable. The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct.

*Bellville*, 702 N.W.2d at 473 (citations omitted). The Court also explained that the first element in a bad faith claim is capable of being decided during summary judgment, stating:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. That is because "'[w]here an objectively

---

[2] Nor would the record support a third-party bad faith claim on Bouma's behalf, even if Van Der Weide tried to assert one. Bouma was not exposed to a judgment that exceeded the policy limits. The consent judgment against Bouma was in the amount of $2,000,000. Doc. No. 15-2 at 104. The policies at issue likewise provided a combined policy limit of $2,000,000. Doc. No. 9-3 at 53-54.

reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.'" As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim.

*Id.* at 473-74 (citations omitted) (alterations in original) (emphasis in original).

As for the second element, "[e]ven when the insurer lacks a reasonable basis for its denial of a claim, liability for bad faith will not attach unless the insurer knew or should have known that the basis for denying its insured's claim was unreasonable." *Bellville*, 702 N.W. 2d at 474.

### b. *Discussion*
#### i. *Reasonable Basis For Denial*

Because a reasonable basis for denial exists when the insured's claim is fairly debatable as to matters of facts or law, I must examine both. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) (citing *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998); *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 96 (Iowa 1995), *overruled on other grounds* by *Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000)). At the outset, however, I note that Cincinnati spends the majority of argument addressing the policy's "your work" exclusion, arguing that this exclusion provided a good faith basis for its denial of coverage. Based on the record before me, however, I cannot find that Cincinnati proffered this exclusion as a reason for denying coverage until the present action commenced. Indeed, so far as I can tell, the first time Cincinnati asserted that coverage was denied under the "your work" exclusion was during its briefing of the previous summary judgment motion in this case. Nothing in the record indicates that Cincinnati relied on this exclusion while explaining its refusal to defend and indemnify during the underlying state court lawsuit.

Under Iowa law, Cincinnati cannot now obtain summary judgment by relying on arguments and explanations that did not form the basis of its actual decision. *See*

*Chadima v. Nat'l Fid. Life Ins. Co.*, 55 F.3d 345, 350 (8th Cir. 1995) ("Otherwise, and under National Fidelity's interpretation of Iowa law, an insurer could avoid bad faith liability simply by relying on the after-the-fact explanation of its own claims personnel."). "[I]mplicit in the first element of a bad-faith claim is the requirement that the insurer actually relied on the reasonable basis in denying coverage." *Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1177 (8th Cir. 2011) (citing *Bellville*, 702 N.W. 2d at 474). Here, there is no evidence in the record that Cincinnati actually relied on the "your work" exclusion when it denied coverage. As such, summary judgment is not appropriate on this theory. Instead, I must consider whether coverage was fairly debatable for the reasons Cincinnati actually proffered.

In its initial coverage denial letter dated January 9, 2014, Cincinnati denied coverage on grounds that there was no evidence that Van Der Weide's home suffered property damage during the policy period. Doc. No. 15-2 at 13. Specifically, Cincinnati stated: "There is simply no allegation contained in the petition or, in fact, any other likely admissible and relevant fact that Van Der Weide's home purportedly suffered physical damage or a loss of use of some kind during Cincinnati's policy period." *Id.*

In my previous order, I made the following findings:

> ***Available Facts***. Before denying a defense and coverage on January 9, 2014, Cincinnati examined the state court pleadings, the policy, the state court's summary judgment rulings, Bouma's answers to interrogatories, Van Der Weide's deposition transcript, expert reports and other discovery materials. One of the expert reports was prepared by Kevin Godwin, who opined: "The primary cause of deterioration is due to the installation of the brick masonry veneer. This wall clearly takes on bulk water intrusion without provision for such water to exit the wall." Doc. No. 9-6 at 27.
>
> Another report, prepared by Donald Staley, concluded that water infiltration occurred as a result of the windows, window installation, masonry construction and deck construction. Doc. No. 9-5 at 10. Neither report identified the time period during which damage to the home began to occur. However, in email messages sent in April and May 2014, Bouma's counsel notified Cincinnati that Godwin and another expert, Charles Lane, would testify that the damage began shortly after substantial

> completion, during the policy period. Even after receiving this information, Cincinnati denied any obligation to defend or indemnify.
>
> Based on the record before me, I find it to be undisputed that by no later than May 5, 2014, Cincinnati was on notice (a) that Van Der Weide alleged defective performance by Bouma's subcontractor caused damage during the policy period and (b) that expert testimony would be presented at trial to support the allegation.

Doc. No. 39 at 11-12 (footnote omitted). Thus, at the time of Cincinnati's initial coverage denial in January 2014, it had a reasonable basis for its coverage decision. However, Cincinnati then received new information that cast doubt on its coverage denial. While the underlying state court case was still pending, Cincinnati was notified of a potential "occurrence" that would have triggered an obligation to indemnify Bouma. Specifically, Cincinnati was advised in April and May of 2014 that two experts had concluded that damage to the home began shortly after substantial completion, during the policy period. In response, Cincinnati not only failed to investigate the new information, but dismissed it out of hand, stating: "I don't understand why you think your 'paid expert's' opinion changes anything." Doc. No. 9-15 at 14-16.

A failure to investigate can lead to an inference of bad faith. *See McIlravy v. North River Ins. Co*, 653 N.W.2d 323, 333 (Iowa 2002) (citing *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254-55 (Iowa 1991)); *see also Etten v. U.S. Food Serv., Inc.*, 446 F. Supp. 2d 968, 979 (N.D. Iowa 2006) (finding that a failure to investigate an insurance claim is probative of the adequacy of Defendant's investigation and whether the claim was fairly debatable). "The duty to act reasonably is an affirmative one, and 'includes the duty to fully and fairly investigate a claim rather than to stand back and deny a claim simply because they wish to deny it.'" *Zimmer v. Travelers Ins. Co.*, 454 F. Supp. 2d 839, 867 (S.D. Iowa 2006) (quoting *Pickering v. Squealer Feeds*, Case No. 99–0295, 2000 WL 961920 at *8 (Iowa Ct. App. July 12, 2000) (citation omitted)). Here, I find that Cincinnati's apparent failure to investigate the new information presented in April and May of 2014 permits an inference that it denied the claim in bad faith. Thus,

I am not able to find, as a matter of law, that the claim was fairly debatable as to the facts.

As for the applicable law, the CGL policy covered Bouma for any "occurrence" during the policy period. "The time of 'occurrence' is when the claimant sustains damages, not when the act or omission causing the damage takes place." *Tacker v. Am. Family Mut. Ins. Co.*, 530 N.W.2d 674, 676 (Iowa 1995) (citing *First Newton Nat'l Bank*, 426 N.W.2d at 623). Thus, under Iowa law, the date of discovery of the damages and the date of the negligent act giving rise to damages are irrelevant when an occurrence policy is at issue. The relevant inquiry is whether damage was sustained during the policy period.

This principle of Iowa law was neither unsettled nor fairly debatable when Cincinnati denied coverage. Indeed, Cincinnati cited *First Newton* in its initial denial letter of January 9, 2014. Doc. No. 15-2 at 13. Thus, when presented with evidence suggesting that some damage occurred during the policy period, Cincinnati had no legal basis to conclude that such evidence was of no significance. Again, then, Cincinnati's apparent failure to investigate the expert opinion information it received in April and May of 2014 is sufficient to permit an inference of bad faith. I am not able to find, as a matter of law, that the claim was fairly debatable as to the law. As to both the facts and the law, reasonable jurors could find that Cincinnati did not have a reasonable basis for denying Bouma's claim.

### 3. *Knowledge*

The second element of a first-party bad faith claim requires a showing that the "insurer knew or should have known that the basis for denying its insured's claim was unreasonable." *Bellville*, 702 N.W. 2d at 474. For reasons similar to those set forth above, I cannot find in Cincinnati's favor as a matter of law on this element. Cincinnati denied coverage on a theory that no damage to the home occurred during the policy period. Upon being advised that experts would testify that the damage began shortly

after substantial completion, during the policy period, Cincinnati seems to have taken no steps to investigate that new information. Instead, it simply reaffirmed its denial of coverage. Based on the current record, reasonable jurors could find that Cincinnati knew, or should have known, that the basis for denying Bouma's claim was unreasonable.

Because genuine issues of material fact exist with regard to both elements of the first-party bad faith claim, Cincinnati's motion for summary judgment on that claim must be denied.

### B. *Count Three – Punitive Damages*

Cincinnati contends that Van Der Weide's claim for punitive damages must be dismissed as a matter of law. Under Iowa law, "[g]enerally, a breach of contract, even if intentional, is insufficient to support an award of punitive damages." *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999). However, a claim for insurance bad faith is a tort. *Villarreal v. United Fire & Cas. Co.*, 873 N.W.2d 714, 734 (Iowa 2016). Thus, "[a]mong other things, compensatory, emotional distress, and punitive damages are available against the insurance company." *Id.* (citing *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790, 794 (Iowa 1988)). Of course, even if the jury finds for Van Der Weide on his bad faith claim, punitive damages are not automatically available. Instead, the jury would have to find, by "a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1.

I have found that Van Der Weide, as Bouma's assignee, is entitled to proceed to trial on his first-party bad faith claim. At this stage of the case, then, I am unable to dismiss the punitive damages claim as a matter of law. Instead, I will evaluate the viability of Van Der Weide's punitive damages claim after he presents his evidence at trial.

## VI. CONCLUSION

For the reasons set forth herein:

1. Defendant's motion (Doc. No. 40) for partial summary judgment is **granted in part** and **denied in part**, as follows:

    a. The motion is **granted** with regard to the third-party bad faith claim asserted in Count II.

    b. The motion is **denied** with regard to the first-party bad faith claim, asserted in Count II.

    c. The motion is **denied** with regard to the claim for punitive damages, asserted in Count III.

2. This case will proceed to trial on all remaining claims, as scheduled.

**IT IS SO ORDERED.**

**DATED** this 30th day of June, 2017.

_____
Leonard T. Strand, Chief Judge